## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 17 2015, 10:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT MOTHER

Donald E.C. Leicht
Kokomo, Indiana

ATTORNEY FOR APPELLANT FATHER

Derick W. Steele
Deputy Public Defender
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Involuntary Termination of the Parent-Child Relationship of Ja.M., X.M., Je.M., and R.M. (Minor Children), and S.J. (Mother) and D.M. (Father)

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 17, 2015

Court of Appeals Case No. 34A04-1409-JT-430

Appeal from the Howard Circuit Court

The Honorable Lynn Murray, Judge

Cause Nos. 34C01-1402-JT-36, 34C01-1402-JT-37, 34C01-1402-JT-38, 34C01-1402-JT-39

**Mathias, Judge.**

[1] S.J. ("Mother") and D.M. ("Father") appeal the order of the Howard Circuit Court terminating their parental rights to their children, Ja.M, X.M., Je.M, and R.M. On appeal, Mother and Father both claim evidence was insufficient to support the trial court's decision to terminate their parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Mother and Father are the biological parents of four children: Ja.M., born in March 2000; X.M., born in August 2001; Je.M., born in November 2002; and R.M., born in December 2003. Mother had a history of neglect of the children, resulting in a previous finding that the children were in need of services. According to Mother, in the previous instance, the children were removed from her care when she was arrested and Father was already incarcerated. Mother claimed that, in this previous instance, the children were returned to her care within two months. Father, too, had a prior involvement with child welfare services in Michigan who found a substantiated allegation of physical abuse.

[4] The present case began in September 2012, when Father had custody of the children because he and Mother were "having some issues," and Mother needed a "break." Tr. p. 94. Father took the children to Michigan via a bus, but during the trip Father suffered a psychotic breakdown and was hospitalized. Child welfare authorities in Michigan took custody of the children and placed them with their paternal aunt, who in turn took them to back to Mother in Kokomo, Indiana. Mother was homeless at the time and contacted the

Department of Child Services ("DCS") for assistance. DCS recommended that Mother and the children stay at a homeless shelter, but Mother declined because, at that time, she had an outstanding warrant for her arrest. Mother was arrested on October 5, 2012, and DCS took custody of the children because Father was still hospitalized in Michigan in a mental health facility.

[5]     On October 9, 2012, DCS filed a petition alleging that all four children were children in need of services ("CHINS"). Both parents denied the allegations in the CHINS petition. The trial court appointed counsel for the parents and appointed a Court Appointed Special Advocate ("CASA") to represent the interests of the children. A hearing was held on the CHINS petition on November 5, 2012, at the conclusion of which the trial court found that the children were CHINS.[1] At the dispositional hearing held on December 3, 2012, the court ordered the children to be wards of DCS and continued their placement in foster care. The trial court also ordered the parents to:

- cooperate and maintain contact with DCS and its family case managers and service providers and follow their recommendations;
- notify DCS of any change in the parents' contact information;
- attend and participate in the visitation plan and follow the rules and procedures set forth by DCS and the service providers coordinating and supervising the visits;
- maintain contact with the case managers and service providers, including notifying them of cancellations of appointments at least twenty-four hours in advance;

---

[1] Father appeared at the hearing in person and by counsel. In fact, it appears that Father appeared in person and by counsel at all of the hearings held in this matter.

- attend, participate in, and complete a parenting program, and provide proof of such completion to DCS;
- maintain gainful employment and provide evidence of such employment to DCS;
- obtain and maintain clean, suitable, and stable housing for themselves and the children and allow DCS and the service providers access to the home;
- refrain from all illegal activity and abide by the law so as to not hamper their ability to care for the children;
- cooperate with and follow the recommendations of "Family Educator Services; and
- attend all medical appointments regarding the children and follow all recommendations of the medical personnel.

In addition, the court ordered that visitation be supervised initially, "which visits may progress to semi-supervised or unsupervised visits at the discretion of the DCS without further order of the Court." Ex. Vol., DCS Ex. 6. The court also ordered Father to attend and participate in individualized mental-health counseling.

[6] Following the CHINS dispositional order, Mother failed to appear at any hearing or have any contact at all with the children for a period of twenty-two months. Father was initially cooperative, and he actively participated with the service providers and worked with his home-based case manager to acquire appropriate housing. He also obtained employment. Father also initially attended all supervised visitation sessions that were scheduled. By the time of the six-month review hearing, though, Father was not compliant with his mental health counseling requirement; he did attend an initial intake appointment but failed to attend any subsequent appointments.

[7] At the September 9, 2013, permanency hearing, the evidence revealed that Father had not been cooperative with the offered services or with DCS. In fact, Father's whereabouts had been unknown for a period, and he failed to respond to the numerous attempts by DCS to contact him. Father completed his mental health evaluation and parenting assessment but failed to follow through with the recommendations given to him and had not attended therapy regularly. When Father did attend the visitations, he brought food for the children but struggled with engaging with the children; instead, he simply provided things for them to do.

[8] By the December 9, 2013, hearing, Father had obtained housing but explained that he would not be allowed to stay there due to a problem with documenting his identity. Father's participation in therapy, services, and visitation was sporadic but improved as the hearing grew closer. Despite the children's desire to remain in foster care, the goal remained reunification of the family.

[9] On February 20, 2014, DCS filed a petition to terminate Mother's and Father's parental rights. At a March 10, 2014, hearing, evidence was presented indicating that Father's participation in services, therapy, and visitation remained inconsistent; in fact, he had not attended any therapy sessions during December and January, although he reported that he had met with his therapist in February. With regard to visitation, three scheduled visits had been cancelled due to weather. Of the other scheduled visits, Father attended five but did not appear for three.

At the termination hearing, held on June 30 and July 21, 2014, the trial court heard evidence that Ja.M., X.M., and R.M. were all diagnosed with adjustment disorder. Je.M. also acted out in sexually inappropriate ways. He was diagnosed with post-traumatic stress disorder, adjustment disorder, and sexual abuse. Father had admitted during a March 2014 Child and Family Team meeting that, while in the parents' care, the children had been exposed to sexually explicit material and had even been sexually abused.[2] Father admitted that he had done nothing to protect his children from this abuse.[3] Je.M. also told his therapist that both of his parents had been physically abusive and that often no food was in the house.

Father's case manager testified that she had helped Father secure housing but that Father was unable to move due to overdue utility bills. Father also was unable to maintain steady employment. He had obtained work several times, but each time, he quit within three months, usually because he complained of being unhappy with the job or had conflict with coworkers. Thus, Father was employed only sporadically. He moved into his current home, a three-bedroom trailer, which he shared with his girlfriend and her children, in February of 2014. In the prior year, Father had attended only nine therapy sessions and attended only approximately one half of his scheduled visits with the children.

At the time of the children's removal, Mother had been arrested and was in jail for two days. After her release, she went to Detroit, Michigan, and had no

---

[2] According to the children's therapist, the culprit was a cousin of the children.

[3] Apparently, Father was hesitant to contact the police because he was involved in illegal activities himself.

contact with the children for twenty-two months. Mother claimed that she had left a telephone message for the DCS case manager the year before the termination proceedings began, but the DCS caseworker testified that she never received such a message. Although Mother obtained employment in May 2014, she still did not have stable housing and lived with different friends and family each day. Mother failed to follow through with any services offered and had no contact with anyone involved in the case until June 2014, when she contacted the CASA.

[13]    On August 18, 2014, the trial court entered findings of fact and conclusions of law granting DCS's petition to terminate the parental rights of Mother and Father. Mother and Father now appeal.

## Standard of Review

[14]    We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). On appeal, we neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence favorable to the trial court's judgment and the reasonable inferences to be drawn from this evidence. *Id*. Where, as here, the trial court enters findings of fact and conclusions of law in its termination of parental rights[4], we apply a two-tiered standard of review.

---

[4] Although trial courts are not statutorily required to enter findings of fact and conclusions of law when terminating parental rights, we have nevertheless held that, given the constitutional import of such a decision, trial courts must "enter findings of fact that support the entry of the conclusions called for by Indiana statute and the common law" when issuing an order terminating parental rights. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

*A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings; we then determine whether the findings support the judgment. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *Id.* Likewise, we will set aside the trial court's judgment terminating a parent-child relationship only if it is "clearly erroneous." *Id.* In this context, "clear error" is that which "leaves us with a definite and firm conviction that a mistake has been made." *Id.* (quoting *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004)).

[15]   "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

[16]   Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

(2)  The petition must allege:
(B)  that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[17]  DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2.  Clear and convincing evidence need not establish that the continued custody of the parents is wholly inadequate for the child's very survival. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).  Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.* If the court finds that the allegations in a petition are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## I.  Mother's Argument

[18]  On appeal, Mother claims only that evidence was insufficient to support the trial court's conclusion that a reasonable probability exists that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(i). We note

that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore, the trial court is required to find that only one prong of subsection 2(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). Here, the trial court found that the first two disjunctive requirements of subsection 2(b)(2)(B) were established: (i) that the conditions which led to the removal of the children would not be remedied, and (ii) that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. *See* Appellant Father's App. pp. 74-75. By not challenging this second disjunctive finding, Mother has waived any argument thereon and effectively conceded this finding on appeal. *See In re Termination of Parent-Child Relationship of J.G.*, 4 N.E.3d 814, 820 n.2 (Ind. Ct. App. 2014), *trans. denied*. Nevertheless, the evidence before the trial court was more than sufficient to show that the continuation of parent-child relationship posed a threat to the well-being of the children. Mother did not visit the children, did not participate in any of the offered services, and was without stable housing at the time of the termination hearing. This is sufficient to support the trial court's determination that the continuation of the parent-child relationship posed a threat to the well-being of the children.

[19] When making a determination as to whether a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S.*, 987 N.E.2d at 1156-

57. The trial court is also required to consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *Id.* at 1157. The trial court may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may also consider the services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead, it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id.*

[20] Mother admits that she was "AWOL" during the CHINS proceedings, *see* Appellant Mother's App. at 10, but claims that this should be excused because of her self-diagnosed depression during that time, which she likens to imprisonment. We note, however, that DCS made service referrals for Mother, including one for a mental-health evaluation. Instead of taking advantage of this referral, Mother wholly failed to participate in any services and made no effort to participate in the CHINS proceedings.

[21] Nor did Mother visit her children. "[F]ailure to exercise the right to visit one's children demonstrates a 'lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.'" *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)).

Although Mother was employed, she still did not have stable housing, and in fact, was homeless at the time of the termination hearing. Given her complete failure to follow through with any services, her effective abandonment of the children, and her continued inability to properly care for the children, we cannot say that the trial court clearly erred in concluding a reasonable probability exists that the conditions which led the children's removal would not be remedied.

## II.  Father's Argument

### A.  Conditions That Led to Removal of the Children Would Not Be Remedied

Father too challenges the trial court's determination that the conditions that led to the children's removal would not be remedied. Although Father participated in the services to a greater extent than did Mother, we cannot say that the trial court's decision was clearly erroneous. The children were removed from Father's care after he suffered a psychiatric breakdown. Father's compliance with the mental health services was sporadic at best. Father did complete a mental health intake appointment but initially failed to attend the scheduled follow-up appointments. Thereafter, his attendance at therapy was, at best, sporadic. By the time of the March 2014 termination hearing, Father had not attended any therapy sessions during December 2013 or January 2014.

After initially attending the scheduled visitations with the children, Father then missed several scheduled visitations, usually without informing DCS that he would not be there. Father was also unable to maintain steady employment,and had only recently moved into a three-bedroom trailer with his girlfriend and her

two children. Under these facts and circumstances, and given our deferential standard of review, we cannot say that the trial court clearly erred in concluding that reasonable probability exists that the conditions that led to the children's removal would not be remedied.

*B. Continuation of the Parent-Child Relationship Poses a Threat to the Well-being of the Children*

[25] Father also claims evidence was insufficient to support the trial court's conclusion that the continuation of the parent-child relationship posed a threated to the well-being of the children. When reviewing the question of whether continuation of the parent-child relationship poses a threat to the child's well-being, termination is proper when the evidence shows that the emotional and physical development of a child is threatened. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 94 (Ind. Ct. App. 2014). Again, we repeat that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired. *Castro v. Ind. Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006).

[26] In addition to the evidence referred to above regarding the parents' inability to properly care for the children was evidence that the children had suffered while in the parents' care. All four children suffered from adjustment disorder, and Je.M. was diagnosed with attention-deficit disorder and post-traumatic stress disorder. Both parents beat the children, did not send the children to school regularly, and did not always have enough food for the children to eat. The

children were not properly cared for when Father was not home, and they were exposed to sexually explicit material and sexual abuse, yet Father did nothing to protect them.[5] Given this history and both parents' lack of progress in improving their parenting skills, the trial court could reasonably conclude that the continuation of the parent-child relationship posed a threat to the well-being of the children.

### C. Termination of the Parent-Child Relationship is in the Best Interests of the Children

Father also challenges the trial court's determination that termination of the parent-child relationship is in the children's best interest. In determining what is in the best interests of a child, the trial court must look beyond the factors identified by the DCS and to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59. Permanency is a central consideration in determining the best interests of a child. *Id.* at 1159.

---

[5] Father denies that he made the statements regarding his knowledge of sexual abuse, but the trial court was free to not believe Father's denials.

[28] Father's argument that termination was not in the children's best interest is as follows:

> Simply because the children have a better life and like their new home better than their previous home with their father is insufficient to overcome the constitutionally protected rights to raise one's own children. It seems that if [Father] has done everything that was asked of him, then he should have the right to raise his children. Otherwise, the Department failed [Father] by not giving him the appropriate goals for reunification. What else is a parent supposed to do?

Appellant Father's Br. at 5.

[29] Father's parental rights were not terminated simply because the children have a better home in foster care than they did with the parents. The children were physically abused and neglected in the parents' care. Nor did Father do "everything that was asked of him" as he claims. *Id*. Specifically, Father failed to complete his mental health therapy, attended visitations with the children only sporadically, and did not maintain steady employment. We also cannot overlook the fact that the children were in foster care for over twenty months. The CASA testified that the children were in "desperate need of permanency," and were "ready to move on with their li[ves]." Tr. p. 97. Both the CASA and the DCS case manager testified that, in their opinions, termination was in the children's best interests. *See A.D.S.,* 987 N.E.2d at 1158 (noting that the recommendation of a case manager or child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show that termination is in the child's best interests). In short, the evidence supports the trial court's determination that

termination of the parent-child relationship was in the best interests of the children.[6]

## Conclusion

[30] The trial court's conclusion that the conditions that led to the removal of the children would not be remedied was supported by sufficient evidence, as was the trial court's conclusion that the continuation of the parent-child relationship posed a threat to the well-being of the children and that termination of the parent-child relationship was in the best interests of the children. The parents' arguments on appeal are little more than a request that we reweigh the evidence, which we will not do. Accordingly, we affirm the order of the trial court terminating both Mother and Father's parental rights.

[31] Affirmed.

Najam, J., and Bradford, J., concur.

---

[6] Father makes no argument that DCS failed to prove that a satisfactory plan for the care and treatment of the children is in place, but even if he did, DCS presented evidence that the plan for the children was adoption, and the current foster mother had expressed interest in adopting the children. This is sufficient. *See Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007) (holding that a plan for adoption was a satisfactory plan for the care and treatment of the children even though there was not yet a specific family in place to adopt the children).